IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | |
|---|---|
| UNITED STATES ) | |
| ) | |
| ) | |
| v. ) | NO. 18-cr-00321 |
| ) | |
| ) | |
| VANESSA BLANCO ) | |
| ) | |

**MOTION FOR COMPASSIONATE RELEASE**

Vanessa Blanco ("Ms. Blanco") asks this Court to reduce her sentence by one year under 18 U.S.C. § 3582(c)(1)(A) so that she can leave the halfway house where she is currently incarcerated and return home to care for her ten-year-old daughter and her mother who is suffering from cancer. Ms. Blanco's motion should be granted because both her family situation and medical conditions constitute extraordinary and compelling circumstances under the U.S. Sentencing Commission guidelines that went into effect November 1, 2023. *First*, Ms. Blanco has a nine-year-old daughter, B., who currently lives with Ms. Blanco's mother, Jenny Rivera, who is incapacitated and cannot take care of the child. She suffers three different forms of cancer -- kidney, bone, and thyroid; the new guidelines specifically list cancer as a condition that warrants compassionate release. Ms. Rivera is 75 years old. Her cancer along with her old age therefore render her incapable of providing the care that B. needs. *Second*, Ms. Blanco has been diagnosed with a teratoma requiring surgery. She entered prison with hernia which the BOP did not treat in a timely way and which now precludes straightforward surgical treatment for the teratoma. The guidelines provide that compassionate release is appropriate when a person requires complex medical care that the BOP is unable to treat effectively.

*Finally*, the purposes of sentencing have been met. Ms. Blanco has been locked up during

a pandemic, confined to an eight by twelve-foot cell with multiple women for months at a time while battling severe health conditions. Ms. Blanco poses no threat to public safety. She is now sober, has taken full responsibility for her actions since her arrest, and deeply regrets the mistakes that led to her incarceration. Ms. Blanco's commitment to rehabilitation is further evidenced by her exceptional prison record. She has taken every course she could get into, completing thirty-six classes. She has also served as a mentor to other incarcerated women in FCI Dublin's Suicide Cadre Program by teaching coping mechanisms and providing moral support to women who struggle with adjusting to the prison environment. Accordingly, Ms. Blanco will not recidivate, as she has been rehabilitated through these experiences and is further deterred by the pain that her absence has caused her family.

On November 8, 2023, Ms. Blanco was transferred to an RRM in Oakland, California, which is 90 minutes from her home. This indicates that the BOP does not believe that she is a threat to the public. The distance is such, however, that her new location does not allow her to be with her daughter or assist her mother. She therefore requests that she be granted compassionate release so that she can be with her family.

## STATEMENT OF FACTS

### A. Personal History

Ms. Blanco was born on November 26, 1982 and spent most of her childhood in San Jose, California, where her family currently resides. Doc. 1 *SEALED* at 10 ("PSR"). Ms. Blanco's early childhood years were relatively stable, and she was close to her father. However, this changed when Ms. Blanco's parents divorced. *Id.* When Ms. Blanco was around six or seven years old, her father disappeared and cut off all communications with her. *Id.* Ms. Blanco learned later that he had been residing in the same city as her the entire time, leading her to feel betrayed and abandoned. Her mother married Peter Rivera in 1994; the pair separated in 2011. *Id.* Ms. Blanco reports that

her mother was a "strict" parent and "very protective" of her three children. Her mother's parenting style, coupled with her unresolved feelings of animus and distrust resulting from her father's abandonment, led Ms. Blanco to rebel as a teenager. *See Id*. at 6 (arrest for credit card theft). She first started using meth in 2007, leading to arrests for property crimes and driving under the influence offenses. *Id.* at 7-8, 12.

In November 2008, Ms. Blanco married Rodrigo Alejandro Torres-Sanchez. *Id.* at 11. During the marriage, the pair moved between San Jose, California, and Arkansas. Her husband was killed in a car accident in 2013, just before Ms. Blanco's daughter, B. was born. This left Ms. Blanco as a single mother with no secure means of support. Ms. Blanco initially relied on Miguel Antonio Portes-Ortega, but their relationship became abusive. Ms. Blanco and her baby lived with a friend for free; in exchange, Ms. Blanco took care of the friend's children while she was at work, making it impossible for Ms. Blanco to work. *Id.* at 11. Faced with few options, Ms. Blanco turned to her late husband's friends who were involved in drug dealing. They arranged for her to transport cocaine from Mexico to the United States in exchange for payment. *Id.* at 3.

**B. Arrest**

On April 18, 2018, Ms. Blanco was arrested when cocaine was found in a hidden compartment of the car she was driving when entering the United States at the Brownsville, Texas border crossing. *Id.* at 3. Ms. Blanco immediately cooperated with authorities, admitting she was working for "Compadre." She pled guilty in June 2018 to possession with intent to distribute 12.68 kilograms of cocaine without benefit of a plea deal, expressing her remorse to the court. *Id.* at 4. On October 30, 2018, she was sentenced to 10 years. Doc. 18.

### C. Family Circumstances

Ms. Blanco was first widowed in 2013 while pregnant with her daughter, B, who is now nine years old. After fleeing an abusive relationship and subsequently becoming incarcerated, Ms. Blanco was left with few options for B's childcare. Ultimately, Ms. Blanco's septuagenarian mother, Ms. Rivera, took custody of B and currently serves as B's day-to-day caregiver. However, Ms. Rivera has been diagnosed with multiple myeloma, a form of cancer that results in kidney damage and frail bones, which has substantially impaired her ability to care for B. Ex. B, Ex. C. The cancer has spread to her spine and ribs, and she has undergone chemotherapy since 2020. Ex. C at 3. Ms. Rivera is now unable to stand or perform household chores for more than five minutes at a time. *Id.* She is unable complete tasks such as cooking, cleaning, and doing laundry and needs to be watched to make sure she does not fall in the shower. Ex. C. at 1, 3. Ms. Rivera also has difficulty remembering to take her medication. *Id*. Her doctor confirms that she suffers from cancer and "would benefit from a full time caretaker at home to help her with daily tasks . . . ." Ex. B.

Ms. Rivera and B. also live with Ms. Blanco's sister, Cori, who is unable to provide childcare or assist her mother to the degree that is needed. Ex. D. She has two sons of her own and works a highly stressful full-time job as a supervisor for the yard of a public transportation agency. She leaves for work at 6:30 a.m. and often works overtime to support the family. *Id*. Because Cori is not able to care for an additional child and Ms. Rivera's medical conditions are gradually rendering her incapable of caring for B, the family requests that Ms. Blanco's sentence be reduced by one year so that she can raise her daughter and care for her ailing mother. *Id*.

### D. Delayed Treatment of Ms. Blanco's Hernia and Teratoma

Ms. Blanco has struggled with serious medical conditions during her incarceration while the BOP has repeatedly delayed treatment. Ms. Blanco reported to prison with a hernia caused by

3

trauma from her seatbelt during a car accident in August 2017. Ex. A at 8, 7, 89, 105; PSR at 11. Because she was pregnant at the time of the crash, doctors were unable to adequately repair the hernia. In 2018, she miscarried while incarcerated, she became septic and had three operations during a two-week stay in the intensive care unit. Ex. A at 77, 105, 113; PSR at 11-12. Doctors pushed the hernia back into her abdomen, but only as a temporary measure. *Id.* at 105 (noting "delayed abdominal closure"). Her medical records show the hernia required "complex repair" and that "minimally invasive repair [is] not recommended." Ex. A at 115. The surgery was supposed to happen after Ms. Blanco lost 10 pounds to facilitate post-operative recovery, which she accomplished by August 2021. Ex. A at 1, 3, 7, 113. The doctors were ready to do the surgery in October 2021. *Id.* at 115.

Although the "large complex abdominal hernia" continued to grow, the BOP failed to schedule the surgery. Ex. A at 58 ("The possibility of strangulation of the bowel is indeed a risk."). The first target date, January 25, 2021 was postponed so that Ms. Blanco could continue to reduce her BMI. By Aug 20, 2021 she had achieved that goal, prompting a request for surgery on September 27, 2021. Ex. A at 1. That surgery was postponed to January 26, 2022. Id. at 105. It was postponed again, resulting in Ms. Blanco reporting ongoing pain and discomfort in May 2022 and requesting a surgery date. *Id.* at 77. at least once more. The reasons for the delay are not recorded in the medical records. The surgery finally took place on July 27, 2022, more than two years after the hernia was first discovered. *Id.* at 73.

During the time Ms. Blanco was waiting for surgery, she had to wear an abdominal binder that had to be replaced frequently and increased in size. Ex. A at 94. She had to request permission to wear her shirt out of her uniform due to the bulge. *Id.* at 15. 25 (requesting new XL binders and help in putting it on); 86 (asking for a larger binder), 87-88 (new XL/L binder). In May 2022, the

4

hernia was described as "an anatomical problem of the intestine on the right side protruding through the abdominal wall." *Id.* at 78. Throughout this period, she suffered from back pain. *Id.* at 7, 13, 79. At the end of May 2022, the pain was up to a 7 on a scale of 1 to 10. *Id* at 77.

Ms. Blanco also suffers from a teratoma that would normally require surgery. When first mentioned in Ms. Blanco's available medical records on October 19, 2020,[1] the growth was a "6.0 cm mixed attenuation lesion in the right and adnexa, likely representing a teratoma." Ex. A at 23. Two years later, the mass had not been removed, and she reported to the clinic with pain and burning in her pelvis at the level of 8 out ten. *Id.* at 123. Although the mass was first noted in October 2020, The BOP did not arrange for a consult until November 24, 2021, when her ob/gyn, Dr. Smith advised not trying to remove the teratoma during a surgery to remove her hernia because Ms. Blanco had a "rather complicated case." *Id.* at 111-12. That surgery did not happen until July 2022, delaying treatment of the teratoma.

Ms. Blanco's teratoma can no longer be readily treated. Ex. A at 168. She had a follow-up consultation with Dr. Smith nearly a year later. Ex. A at 192 ("I last saw MS BLANCO on 11/24/*21*") (emphasis in original). Due to the complex nature of her hernia surgery, which was delayed without known reason for nearly a year, the "likelihood is great of an extremely difficult surgery" to remove the teratoma." *Id*. On November 1, 2022, the growth was described as a "right adnexial 6x5.5x5.5 cystic mass c/w ovarian teratoma;" the doctor recommended follow-up ultrasounds every six months. *Id.* at 178. By June 2023, it had grown to 7.29x6.37x6.37 and the doctor recommended ultrasounds every 3 months to be sure that it is not malignant. Id. at 188. (stating "very high risk of complications due to mesh/previous surgeries").

---

[1] The Bureau of Prisons will provide the previous two years of medical records upon request but anything earlier must be request through a FOIA request which can take up to nine months to process.

### E. Procedure

Ms. Blanco filed two *pro se* motions for compassionate release, which were denied because the first failed to attach medical records and the second appeared to be a photocopy of the first. Docs 21, 24 (orders of denial). This is Ms. Blanco's first motion for a reduction in sentence prepared with the assistance of counsel. Counsel reached out to the government via email on November 8, 2023 to confer before filing. In a prompt and courteous reply, the government indicated that it needed to review the motion and supporting documentation before taking a position.

## ARGUMENT

A court must answer three broad questions to determine if compassionate release is warranted. 18 U.S.C.§ 3582(c)(1)(A). First, the court must determine whether the defendant has exhausted all administrative remedies. *See, e.g., United States v. Franco*, 973 F.3d 465, 467 (5th Cir.), *cert. denied*, 141 S. Ct. 920 (2020). Second, the court evaluates whether "extraordinary and compelling circumstances" warrant a reduction of the term of imprisonment that the court previously imposed. *Id.* Finally, the court must consider whether any such reduction is consistent with the statutory purposes of sentencing and the "applicable guidelines." *Id.*; *see also* 18 U.S.C. § 3582(c)(1)(A); 18 U.S.C. § 3553(a).

### I. MS. BLANCO IS ELIGIBLE FOR COMPASSIONATE RELEASE BECAUSE SHE HAS EXHAUSTED HER REMEDIES

Ms. Blanco has completed all the steps necessary to exhaust her administrative remedies. Anyone seeking compassionate release from the courts must first request relief from the Warden and wait 30 days for a response. 18 U.S.C. § 3582(c)(1)(A). See P.L. 115-391, 132 Stat. 5194, at § 603 (Dec. 21, 2018). Ms. Blanco submitted a request for release twice. Her first request for a sentence reduction was denied by the warden at Dublin FCI on June 11, 2020. *United States v. Blanco*, No. 2:18-321, (S.D. Tex. Jun. 9, 2021). Ex. E at 1. Ms. Blanco again requested compassionate release with a new application on August 29, 2022. Ex. E at 2. She was then told

6

that she could not be considered for release under the CARES Act with a pending compassionate release request, so she withdrew her request but, upon reflection, "withdrew her withdrawal." *Id.* She was advised to resubmit the compassionate release request, which she did on October 29, 2022. Ex. E at 3. The Warden did not respond to her October 29 submission.

Therefore, the BOP has had the opportunity to consider Ms. Blanco's arguments that the incapacitation deteriorating health of her mother, amounting to incapacitation of her daughter's caregiver, warrants compassionate release. The purpose of exhaustion is the give an agency a chance to implement its policies efficiently or to correct its own mistakes. *Woodford v. Ngo*, 548 U.S. 81, 89 (2006). In spite of some bureaucratic confusion based on the BOP's willingness to consider Ms. Blanco for CARES Act, Ms. Blanco has exhausted her administrative remedies so that this Court may consider her case.

## II. MS. BLANCO'S SITUATION IS EXTRAORDINARY AND COMPELLING BECAUSE HER CHILD'S CURRENT CAREGIVER IS INCAPACITATED AND THE BOP HAS NEGLECTED HER MEDICAL CARE.

Ms. Blanco can demonstrate "extraordinary and compelling" circumstances warranting early release for two reasons. 18 U.S.C. § 3582(c)(1)(A). First, Ms. Blanco's situation is extraordinary and compelling because Ms. Blanco's mother, Jenny Rivera, who has custody of Ms. Blanco's daughter B, suffers from multiple forms of cancer and can no longer care for her granddaughter. Second, the BOP was unable to arrange for hernia surgery for Ms. Blanco, complicating treatment of an ovarian teratoma and causing permanent disfigurement.

### A. Ms. Blanco's Family Situation is Covered Under the 2023 Amendments to the Sentencing Guidelines for Compassionate Release

Compassionate Release was first introduced as part of the Comprehensive Crime Control Act of 1984, which abolished federal parole. Section 3582(c) created compassionate release as a limited replacement by allowing a district court to modify "term of imprisonment" when "extraordinary and compelling reasons warrant such a reduction." 18 U.S.C. § 3582(c)(1)(A)(i).

7

Congress did not define what would constitute an "extraordinary and compelling reason," but the legislative history gives some guidance. The Comprehensive Crime Control Act created a "completely restructured guidelines sentencing system." S. Rep No. 98-225, at 53 n.196 (1983). Specifically, the Senate Committee acknowledged the possibility of changed circumstances, stressing that a mechanism was needed to handle individual cases that warranted a second look at resentencing in the absence of parole:

> The Committee believes that there may be unusual cases in which an eventual reduction in the length of a term of imprisonment is justified by changed circumstances. These would include cases of severe illness, cases in which other extraordinary and compelling circumstances justify a reduction of an unusually long sentence, and some cases in which the sentencing guidelines for the offense of which the defendant was convicted have been later amended to provide a shorter term of imprisonment.

*Id.*, at 55–56 (emphasis added). Congress intended for the situations listed in § 3582(c) to act as "safety valves for modification of sentences," *id.* at 121, when justified by various factors that previously could have been addressed through the (now abolished) parole system. Section 603(b) of the First Step Act of 2018 further allowed defendants themselves to bring motions for modification of a sentence, indicating Congress' intent to broaden the use of compassionate release by allowing defendants to bring their own motions detailing their extraordinary and compelling circumstances. *United States v. Ennis*, No. EP-02-CR-1430-PRM-1, 2020 U.S. Dist. LEXIS 84957, at *11-12 (W.D. Tex. May 14, 2020); *see also United States v. Rodriguez*, 424 F. Supp. 3d 674, 682 (N.D. Cal. 2019).

The 2023 amendment to the Sentencing Guidelines furthers the legislative purpose by relaxing the requirements for compassionate release and creating more circumstances in which the "extraordinary and compelling" standard would apply.[2] The Commission expanded the type of family circumstances that warranted release, covering both "incapacitation of the caregiver of the

---

[2] available at https://www.ussc.gov/sites/default/files/pdf/amendment-process/federal-register-notices/202305_FR.pdf

8

defendant's minor child" and "incapacitation of the defendant's parent when the defendant would be the only available caregiver." *Id.* The new guidelines do not require that Ms. Blanco demonstrate that no other caretaker for her daughter is available; she must only show that her child's caretaker is incapacitated, of which there is ample evidence. *United States v. Streeter*, No. 23-10233, 2023 WL 6476620, at *2 (11th Cir. Oct. 5, 2023). In contrast, compassionate release for someone seeking to care for aged parents does carry the additional requirement that the movant be the only available caregiver. A reduction in sentence would also be appropriate if "the defendant is suffering from a medical condition that requires long term or specialized medical care, without which the defendant is at risk of serious deterioration in health or death, that is not being provided in a timely or adequate manner." *Id.*

### B. Ms. Blanco's Mother, also the Caretaker of her Daughter, is Incapacitated, Which Qualifies as an Extraordinary And Compelling Reason For Release

    a. Ms. Blanco's Mother Cannot Care for B.

Ms. Blanco qualifies for compassionate release because of her extraordinary and compelling family circumstances. Even before the First Step Act, the death or incapacitation of a caregiver was one of the grounds for compassionate release. U.S.S.G. §1B1.13. The updated guidelines state that the "incapacitation of the caregiver of the defendant's minor child" can constitute extraordinary and compelling circumstances. FCJ Federal Sentencing Guidelines Manual § 1B1.13(b)(3)(A) (11/1/23). The touchstone for reducing a sentence on this ground is the welfare of the child. Therefore, if the child's caregiver is no longer able to perform that function, extraordinary and compelling circumstances can apply. *United States v. Warren*, No. 3:18-CR-136-MOC, 2021 WL 1341049, at *4 (W.D.N.C. Apr. 9, 2021) (granting because grandparents were no longer able to care for their three grandchildren).

Ms. Blanco's mother is unable to care for her ten-year-old daughter, justifying compassionate release. BOP Program Statement 5050.50 defines incapacitation as "the family

9

member caregiver … suffers from a severe illness (e.g., cancer) that renders the caregiver incapable of caring for the child." Federal Bureau of Prisons, Program Statement 5050.50 at 7 (January 17, 2019). Courts in the Fifth Circuit "frequently consider the Policy Statement when assessing whether to grant a defendant compassionate release." *United States v. Barrios*, No. EP20CR018381DCG, 2022 WL 7265985, at *4 (W.D. Tex. Sept. 27, 2022). B's caretaker, her grandmother, has multiple myeloma and self-reports thyroid cancer, all of which have severely impaired her health. Ex. B, Ex. C. According to the Mayo Clinic, in "multiple myeloma, cancerous plasma cells accumulate in the bone marrow and crowd out healthy blood cells." Myeloma cells produce deformed antibodies that eventually damage the kidneys and weaken bones, increasing the chance of fracture.[3] In fact, Ms. Rivera recently suffered two broken ribs which have further hindered her ability to take care of her granddaughter. *See* Ex. C at 3.

Because of her debilitating symptoms, Ms. Blanco's mother is unable to care for B properly. Ms. Rivera cannot walk B to school and back the neighborhood they live in is not safe for a child walking alone. Ex. D. She is no longer able to cook full meals and finds it difficult to do simple tasks, as standing for more than 5 to 10 minutes is very taxing for her. *United States v. Woolfolk*, No. 5:19-cr-37 (MTT), 2022 U.S. Dist. LEXIS 201771, at *7 (M.D. Ga. Nov. 4, 2022) (granting compassionate release because the defendant's mother has severe illness including diabetes, heart failure, hypertension, blood clots that made her incapable of taking care of the defendant's children). Under the BOP's own policy statement, Ms. Blanco's mother is "incapacitated," thus meeting the extraordinary and compelling requirement for compassionate release.

Ms. Riviera's incapacitation counsels strongly in favor of compassionate release. A mother with a drug distribution conviction was granted compassionate release based on her vulnerability to COVID-19 and the fact her 65-year-old mother was caring for her three children. *United States*

---

[3] Mayo Clinic Staff, Multiple Myeloma (Dec. 14, 2022), https://www.mayoclinic.org/diseases-conditions/multiple-myeloma/symptoms-causes/syc-20353378

10

*v. Solorio Quintero*, No. 115CR00319LHRSKO6, 2021 WL 1225976, at *2 (E.D. Cal. Apr. 1, 2021). Here, Ms. Blanco's mother suffers from more severe health concerns than the caregiver in the *Solorio-Quintero* case: Ms. Rivera has been diagnosed with cancer whereas the other grandmother suffered from asthma and obesity. *Id.* She is also nearly ten years older. Nor is it dispositive that B is an only child. The unstable situation of an 11-year-old being shuttled back and forth between his grandmothers' homes because neither had the time nor resources to care for him full-time was sufficient grounds for a reduction in sentence. *United States v. Murry*, No. 15-CR-00153-05, 2021 WL 795451, at *4 (S.D. Ind. Mar. 2, 2021) (granting release to the father whose 11-year-old son was deemed an at-risk child); *United States v. Groat*, No. 2:17-CR-104, 2021 WL 1238101, at *4 (D. Utah Apr. 2, 2021) (granting release to defendant whose wife needed help caring for disabled daughter). Here, 73-year-old Jenny Rivera is taking care of a nine-year-old by herself while battling cancer. Her deteriorating medical conditions have already undermined B's care and the situation will only continue to get worse.

### b. Ms. Blanco's Mother Cannot Care for Herself

Ms. Blanco's mother's deteriorating health can also itself justify granting compassionate release. Under the 2023 amendments to the Sentencing Guidelines, "incapacitation of the defendant's parent when the defendant would be the only available caregiver for the parent" also qualifies as an extraordinary and compelling circumstance. § 1B1.13(b)(3)(B) (11/1/23). Ms. Rivera has a lengthy list of severe health conditions that now require constant care. Her doctor writes that "Due to the effects of her cancer and side effects of treatment, she would benefit from a full-time caretaker at home to help her with daily tasks such as grocery shopping, cooking, and cleaning. Ex. B. Given her working schedule, Cora is not able to perform this function. Ms. Rivera has two sons, one of whom is serving in the military and is stationed elsewhere and the other has no contact with the family. PSR at 10-11. No one other than Ms. Blanco can care for her daughter and mother.

Ms. Blanco is needed at home to care for both her daughter and her mother. Although an incarcerated parent does not have to demonstrate that there is no other caretaker available for a child, such an absence is a prerequisite for release to care for an aging parent. *United States v. Seals*, 509 F. Supp. 3d 259, 262 (E.D. Pa. 2020). Ms. Blanco's sole sibling, Cori, cannot care for her mother as she works to support the family, including her teen-aged children, B, and Ms. Rivera. To make ends meet, Cori frequently works overtime. Her teen-aged sons go to school full-time and are not appropriate caregivers for an incapacitated woman and a ten-year-old girl. Ex. D. Ms. Rivera and B represent two classes of individuals that the Sentencing Guidelines hoped to protect – the minor child and the incapacitated parent. Without Ms. Blanco home to serve as their caregiver, both will not receive adequate care. Ms. Blanco therefore asks this Court to grant her petition for compassionate release in light of these extraordinary and compelling familial circumstances.

### C. Ms. Blanco's Medical Conditions Constitute an "Extraordinary and Compelling" for Compassionate Release Because the BOP Has Provided Inadequate Medical Care

*1. The BOP Has Failed to Provide Ms. Blanco Adequate Medical Treatment*

Ms. Blanco's delayed medical care is a compelling reason for granting compassionate release. Under the new Guidelines, compassionate release can be given to someone "suffering from a medical condition that requires long-term or specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death." § 1B1.13(b)(1)(C) (11/1/23); *United States v. Beck*, 425 F. Supp. 3d 573, 574 (M.D.N.C. 2019) (granting a reduction in sentence because of the movant's "invasive cancer and BOP's history of indifference to her treatment"); *United States v. Robles*, No. 19CR4122, 2022 WL 229362, at *2 (S.D. Cal. Jan. 26, 2022) (granting compassionate release after the BOP did not schedule needed open-heart surgery after Ms. Robles had five strokes); *United States v. Almonte*, No. 3:05-CR-58 (SRU), 2020 WL 1812713, at *7 (D. Conn. Apr. 9, 2020) (finding that the BOP's repeated failure

to arrange for treatment of the movant's serious spine condition which led to deterioration in his condition warranted compassionate release).

Care for Ms. Blanco's medical needs has been delayed ever since she first arrived at FCI Dublin in 2018. She immediately informed staff that she had a right flank hernia that required surgery. It apparently took two years for the BOP to arrange consults that confirmed that Ms. Blanco needed surgery. During that time, she also developed a teratoma, which the Cleveland Clinic defines as "a rare type of germ cell tumor that may contain immature or fully formed tissue, including teeth, hair, bone and muscle."[4] Teratomas can be cancerous and treatment is usually surgical removal. *Id.*, n.4. In November 2021, her ob/gyn advised against trying to remove the teratoma at the same time as the hernia surgery, however, noting that removing the hernia would be a sufficient challenge. Ex. C at 125. For unknown reasons, Ms. Blanco's hernia surgery was repeatedly put off until July 2022. By the time her ob/gyn saw here again nearly a year later, he stated that surgery for the teratoma would be too dangerous, although that would be the normal course of treatment. Ex. E at 145.

By delaying four years in providing needed medical treatment, the BOP has placed Ms. Blanco's health in jeopardy. Its response has left her permanently deformed. "BOP delays in treatment of serious disorders can constitute or contribute to finding extraordinary and compelling circumstances" *United States v. McPeek*, 2022 WL 429249, at *9 (N.D. Iowa Feb. 11, 2022) (collecting cases). If her teratoma continues to grow, a sign of malignancy, Ms. Blanco would need to undergo a lengthy series of "long term or specialized medical care" that is necessary to prevent a "serious deterioration in health or death," which the 2023 proposed amendment to the Sentencing Guidelines determines to be an extraordinary and compelling reason for release. Mismanaged care of serious health concerns, even if not yet life-threatening, "presents an extraordinary and

---

[4] https://my.clevelandclinic.org/health/diseases/22074-teratoma

13

compelling reason for release." *United States v. English*, 2022 WL 17853361, at *7 (E.D. Mich. Dec. 22, 2022). Ms. Blanco faces the eventual possibility of dangerous surgery to preserve her fertility, a situation exacerbated by the BOP taking four years to arrange hernia surgery.

### III. MS. BLANCO'S TIME SERVED HAS FULFILLED THE PURPOSES OF HER SENTENCE UNDER SECTION 3553(a)

Ms. Blanco has demonstrated extraordinary and compelling circumstances to justify compassionate release. This Court must also consider the 18 U.S.C. § 3553(a) sentencing factors in reducing any sentence. The parsimony principle "instructs courts to 'impose a sentence sufficient, but not greater than necessary, to comply with the four identified purposes of sentencing: just punishment, deterrence, protection of the public, and rehabilitation." *Dean v. United States*, 137 S.Ct. 1170, 1175 (2017) (citing §3553(a)(2)(A)–(D)). To assess whether a person presents a danger, a court considers the charge, weight of evidence, health, family ties, and social history. 18 U.S.C. § 3142(g).

The sentencing judge intended that Ms. Blanco suffer serious consequences for her actions and his goal has been fulfilled, although perhaps not how he envisioned. Time served during a deadly pandemic is more difficult because the "the conditions of confinement [are] harsher, both physically and psychologically, than they would otherwise normally be." *United States v. Henareh*, No. 11-CR-93-1 (JSR), 2021 WL 119016, at *5 (S.D.N.Y. Jan. 13, 2021). Ms. Blanco has served 85% percent of her sentence, and transferred to a RRM in Oakland California on November 8, 2023; she is due to be released on October 27, 2024. She has successfully completed the RDAP program, a critical step in making sure that her abuse of drugs is in the past. Ms. Blanco is back in the community; the question is only whether she will be able to take care of her daughter and ailing mother or whether their separation will continue due to the restrictions of a halfway house.

Although Ms. Blanco had a troubled youth, her criminal history is in the past and does not preclude a minor reduction in her sentence. Those with much more serious rap sheets have been granted

14

compassionate release. *United States v. Ford*, No. EP-15-CR-01851-DCG, 2020 WL 8087945, at *1 (W.D. Tex. Dec. 23, 2020) (granting compassionate release after acknowledging the defendant's criminal history, which involves prior convictions for felony drug, forgery, and theft, "weighs against her"); *United States v. Ikegwuonu*, No. 15-CR-21-WMC-1, 2021 WL 719160, at *3 (W.D. Wis. Feb. 24, 2021) (granting compassionate release after defendant pled guilty to five counts of armed robbery and one count of brandishing a firearm, after taking the defendant's regret for letting his family down and his need to take care of his sick mother into account). Furthermore, Ms. Blanco has a nearly-clean disciplinary history. She received one disciplinary infraction for "cheeking" a pill that she did not want to take because it "made her feel like a zombie." Nothing in the record suggests that Ms. Blanco will pose a danger to her community if she is released.

Ms. Blanco has also worked extensively at self-improvement during her incarceration. The Supreme Court held that "evidence of post-sentencing rehabilitation may plainly be relevant to 'the history and characteristics of the defendant.'" *Pepper v. United States*, 562 U.S. 476, 491 (2011) (citing § 3553(a)(1)). Rehabilitation is a critical factor in determining if a person should be granted compassionate release. *United States v. Brown*, No. 4:05-cr-00227-1, 2020 WL 2091802, at *7 (S.D. Iowa Apr. 29, 2020). Ms. Blanco has already accomplished several of the goals she identified for her incarceration at the time of sentencing, especially honing her parenting skills. She has completed thirty-six educational courses, including several that enhanced her parenting skills, indicating her concern for her daughter and determination to be an exemplary parent. Ex. F; *contra United States v. Dawkins*, No. CR 08-412, 2021 WL 1946662, at *4 (W.D. Pa. May 14, 2021) (father failed to provide evidence of being a suitable caregiver).

Ms. Blanco has sobered and matured during her incarceration. She has acted as a mentor to other incarcerated women through FCI Dublin's Suicide Cadre Program, providing emotional support to fellow inmates who have had a difficult time adjusting to incarceration. Women whom Ms. Blanco has mentored describe her as a "positive, encouraging, and trustworthy person." Ex K at 1. The wealth of evidence demonstrating Ms. Blanco's rehabilitation weighs in favor of her release.

Finally, Ms. Blanco has developed a re-entry plan as follows:

"My name is Vanessa Maria Blanco and if I were to be granted compassionate release I would release to my mother's house at . . . . Plumstead Way, San Jose, CA. My mother's home is a stable household. She has owned her home for 32+ years. I have my own room and as soon as I get my license renewed, I will have access to my mother's car. She has already given me permission to use the vehicle to look for a job. My mom needs me to be her caretaker and also drive her to doctor's appointments. My mom has agreed to support me but I plan on getting a job at the local grocery store. There are 3 nearby and I have experience working at the grocery store already. I plan on setting and maintaining a routine so I maybe a responsible individual."

## CONCLUSION

For the reasons stated above, Ms. Blanco respectfully requests that this Court consider her motion as expeditiously as possible and reduce her sentence to time served with whatever conditions might be appropriate.

Respectfully submitted,

Catherine Sevcenko
DC Bar No 484218
National Council for Incarcerated and Formerly Incarcerated Women and Girls
300 New Jersey Ave, NW #900
Washington DC 20001
617-299-2604 x703
csevcenko@thecouncil.us

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was filed with the Southern District of Texas and a copy was served on all counsel of record via ECF on November 14, 2023.

/s/ _Catherine Sevcenko_____

16